Sairo GARCIA, Eloisa Gomez Garcia, individually and as Administrator for the Estate of Jose David Milian Mendoza and Empresa Portuaria Quetzal, Plaintiffs,

v.

M/V KUBBAR, her engines, tackle, apparel, appurtenances, etc., in rem, Defendant.

M/V KUBBAR, her engines, tackle, apparel, appurtenances, etc., in rem, Defendant and Third–Party Plaintiff,

v.

FLOTA MERCANTE GRANCOLOMBIANA, S.A., Third–Party Defendant.

No. 95–CV–1150 (LEK/DRH).

United States District Court,
N.D. New York.

Jan. 20, 1998.

---

Office of Peter A. Tulin, Saratoga Springs, NY, Peter A. Tulin, of counsel, Ballen, Gertel & Dicintio, Cherry Hill, NY, Jane M. Fearn–Zimmer, of counsel, Feldman & Troup, New York City, Steven Troup, of counsel, for Plaintiffs.

Clark, Atcheson & Reisert, New York City, Frank A. Atcheson, of counsel, for Defendant and Third–Party Plaintiff.

Walker & Corsa, New York City, R. Brett Kelly, of counsel, for Third–Party Defendant.

### MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

This admiralty *in rem* action commenced with the arrest of defendant M/V KUBBAR, a merchant cargo vessel registered under the laws of Kuwait. The defendant now moves for summary judgment on the grounds that plaintiffs have failed to establish the existence of a maritime lien that is a prerequisite for *in rem* jurisdiction. For the reasons discussed below, defendant's motion is granted.

## I. Background

### A. Facts

The core event of this action is an accident in the Port of Quetzal, Guatemala, involving two stevedores, the plaintiff Sairo Garcia ("Garcia") and Jose David Milian Mendoza ("Mendoza"), both Guatemalan citizens. On July 10, 1995, the two men were loading boxes from the dock onto the vessel M/V KUBBAR ("vessel" or "defendant") using a crane, under the supervision of the crew of the vessel. Loading cargo required the stevedores to ride with the boxes as they were lifted onto the ship, and the men would thus periodically be elevated to a substantial height over the dock. At some point during the day, while they were so elevated, a wire in the crane snapped and the men fell approximately thirty feet. Mendoza, whose leg was severed by the crane's hook assembly during the fall, was killed and Garcia suffered serious injuries. In addition, plaintiff Empressa Portuaria Quetzal ("EPQ"), the owner of the dock, suffered property damage to its dock and equipment. Plaintiffs allege that the crane failed because of the negligence of the vessel and its crew in maintaining the "seaworthiness" of the equipment.

At the time of the accident, the vessel had been subchartered by third-party defendant Flota Mercante Grancolombiana, S.A. ("FMG") from a company called Industrial Maritime Carriers (Bahamas) Inc., who themselves had chartered the vessel from its owner, Kuwait Maritime Transport Company ("KMT" or "owner") on or around November 9, 1994.

After the accident, the ship was detained pursuant to local court order, and the matter forwarded for hearing before the Second Court of the First Instance in the City of Escuintla, Guatemala ("Second Court"). On July 13, 1995, the Second Court issued an order releasing the ship from detention, and on the same day, after obtaining a Sailing Order from the Captain of the port, the vessel departed Puerto Quetzal. Plaintiffs allege that defendant obtained the release order unlawfully by making pay-offs to the local Justice. They also allege that they made numerous attempts to arrest the vessel in its subsequent travels, but only caught up with it when it reached Albany, New York around August 16, 1995.

### B. Procedural History

Plaintiffs filed a complaint in this Court on August 18, 1995 and obtained a warrant for arrest *in rem* of the M/V KUBBAR on the same day. On August 19, 1995, the vessel was released by order of Judge Cholakis after the posting of a letter of undertaking promising to secure the plaintiffs' claims up to $1,500,000.

Defendant first submitted an answer on September 11, 1995, which also stated counter-claims against EPQ, the dock owner. EPQ then answered on October 6, 1995. Defendant filed a third-party complaint against FMG, the sub-charterer, on February 13, 1996, which FMG answered on April 15, 1996. FMG also made counter-claims against both the defendant and EPQ, which defendant answered on April 25, 1996 and EPQ answered on June 12, 1996.

Defendant filed an amended answer to the complaint on June 10, 1996. This amended answer added several affirmative defenses, including an objection to *in rem* jurisdiction.

On November 15, 1996, plaintiffs submitted a legal brief, apparently intended as a motion, arguing for the application of American law and the continuance of the action *in rem* in this Court. On February 24, 1997, defendant cross-moved for summary judgment. The issues of both motions (taking plaintiffs' November 15 brief to be an adequate motion) are identical—whether foreign law must be applied to this action, and what the legal consequences are.

## II. Discussion

On a motion for summary judgment, the movant bears the burden of persuading the court that the record demonstrates "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Genuine issues exist if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once a movant has carried her initial burden, the respondent "must do something more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion, the court must view the facts in the light most sympathetic to the nonmovant. *Id.* at 587, 106 S.Ct. 1348 (quotation omitted). The district judge's inquiry is whether a triable issue exists with respect to the claim being moved upon—that is, whether there is enough of a material dispute over key facts that the finder of fact could reasonably decide either way. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

Defendant M/V KUBBAR has moved for summary judgment, arguing that the case is governed by Guatemalan law, and that, under that law, there is no maritime lien for harm done to stevedores through the negligence of the ship owners, and thus no basis for an *in rem* action. Plaintiffs argue that United States general maritime law should govern the determination of whether the lien exists. They further argue that defendants have consented to jurisdiction.

*A. In Rem Jurisdiction and the Necessity of A Maritime Lien*

Rule C(1)(a) of the Supplemental Admiralty and Maritime Claims Rules sets forth the conditions upon which one may file an *in rem* action: "[a]n action in rem may be brought (a) [t]o enforce any maritime lien [or] (b) [w]henever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto." Rule C, Supplemental Rules For Certain Admiralty and Maritime Claims. Plaintiffs do not argue that their *in rem* claim is provided for by a federal statute. Thus, they must establish the existence of a maritime lien to support *in rem* jurisdiction. *See Sembawang Shipyard, Ltd. v. Charger, Inc. and M/V Charger*, 955 F.2d 983, 987 (5th Cir.), *reh. denied*, 963 F.2d 372 (1992); *Hunley v. Ace Maritime Corp.*, 927 F.2d 493, 496 (9th Cir.1991) (a maritime action *in rem* will be available "only in connection with a maritime lien"); *Amstar Corp.*

*v. S/S Alexandros T.*, 664 F.2d 904, 908 (4th Cir.1981)("A maritime lien is an essential predicate for the arrest of a vessel in a private in rem action.") In the absence of such a lien, the *in rem* action may not continue.

Whether such a lien exists is a question of substantive law. *See Amstar Corp*, 664 F.2d at 908 (maritime liens are "an integral aspect of substantive, rather than procedural maritime law"); *Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. Camilla*, 966 F.2d 613, 615 (11th Cir.1992) (same). Substantive law, unlike procedural law, must be applied according to choice-of-law principles. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 778 n. 10, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). These principles require a court to apply the substantive law of a foreign forum where that foreign jurisdiction has the greatest interests in the litigation. *Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 86, 89 (2d Cir.1996), *cert. denied, Veritas v. Carbotrade S.P.A.*, — U.S. —, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997).

Thus, courts which find that foreign law applies in a maritime action must apply that law to determine if a valid maritime lien exists and an *in rem* proceeding may thereby continue. *See Ocean Ship Supply, Ltd. v. M/V Leah*, 729 F.2d 971, 972–73 (4th Cir. 1984) (to determine whether [plaintiff] held such a maritime lien as would warrant an *in rem* seizure of vessel, court first applied choice-of-law analysis); *Metron Communications, Inc. v. M/V Tropicana*, 1992 WL 532637, *4, No. 89–2460–CIV (S.D.Fla. March 6, 1992) (disposition of *in rem* claim depended on whether Greek or American law applied to determine whether maritime lien existed); *Castelan v. M/V MERCANTIL PARATI*, 1991 WL 83129, *4, Civ. A. No. 91–1351 (D.N.J. May 8, 1991) (plaintiff had no maritime lien under English law, and therefore no right to proceed *in rem*).

Federal maritime choice-of-law questions are decided under the test established by the Supreme Court in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) as amended in *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79

S.Ct. 468, 3 L.Ed.2d 368, *reh. denied,* 359 U.S. 962, 79 S.Ct. 795, 3 L.Ed.2d 769 (1959) and *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252, *reh. denied,* 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970)(*"Rhoditis"*). Although *Lauritzen* involved a maritime tort claim under the Jones Act, the Supreme Court has held that "[t]he broad principles of choice of law and the applicable criteria of selection set forth in *Lauritzen* were intended to guide courts in the application of maritime law generally." *Romero,* 358 U.S. at 382, 79 S.Ct. 468. In particular, the Second Circuit has relied on the *Lauritzen* test to determine which law to apply in deciding whether plaintiff possesses a maritime lien. *See Rainbow Line, Inc. v. M/V Tequila,* 480 F.2d 1024, 1026 (2d Cir. 1973). The Court therefore relies upon the *Lauritzen* test to determine the existence of a maritime lien in this case.

█ The *Lauritzen* test requires the Court to consider the following seven factors: 1) the place of the wrongful act; 2) the law of the flag; 3) the allegiance or domicile of the injured; 4) the allegiance of the shipowner; 5) the place of contract; 6) the inaccessibility of a foreign forum; and 7) the law of the forum. In *Rhoditis,* 398 U.S. at 309, 90 S.Ct. 1731, the Court also suggested that the shipowner's base of operations may be relevant.

█ The *Lauritzen* test is not satisfied by a mechanical counting of contacts, and the list above is not intended to be exhaustive. *See Rhoditis,* 398 U.S. at 308–9, 90 S.Ct. 1731. A conclusion that American law is applicable to a maritime case is warranted only if the Court discovers a more than minimal nexus between the claim and the American forum. *Pandazopoulos v. Universal Cruise Line, Inc.,* 365 F.Supp. 208, 210 (S.D.N.Y.1973). The contacts found need not be preponderant, but must be substantial. *Bartholomew v. Universe Tankships, Inc.,* 263 F.2d 437, 440 (2d Cir.), *cert denied, Universe Tankships, Inc v. Bartholomew,* 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959).[1]

## B. Application of The Lauritzen Test

No evidence has been provided on the owner's base of operations, and so that factor is not considered.

### 1. The Place of the Wrongful Act

The parties do not dispute that the place of the wrongful act was Guatemala. However, plaintiffs argue that this factor should not be given much weight. Generally, "in the case of shipboard torts, the location of the wrongful act is of minimal importance." *Quintero,* 914 F.2d at 722 (citing *Lauritzen,* 345 U.S. at 571, 73 S.Ct. 921 (noting that "[the location of the wrongful act] is of limited application to shipboard torts, because of the legal authority over water she may navigate.")) However, this rule is founded on a concern that the legal relationship between a sailor and the ship should not continually vary depending on where the ship travels. *See Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 384, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) ("The amount and type of recovery which a foreign seaman may receive from his foreign employer while sailing on a foreign ship should not depend on the wholly fortuitous circumstances of the place of injury"); *Quintero,* 914 F.2d at 723 ("Ships are designed to

1. Plaintiffs argue that the *Lauritzen* choice-of-law analysis is not applied to cases of subject matter jurisdiction. *See Neely v. Club Med. Management Services, Inc.,* 63 F.3d 166, 177 (3rd Cir.1995) (en banc).

Plaintiffs have confused the issue of subject matter jurisdiction and the separate issue of *in rem* jurisdiction. Subject matter jurisdiction in this case is admiralty, and a court determines whether there is admiralty jurisdiction by the test established in *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), recently reaffirmed in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). "[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Id.* 115 S.Ct. at 1048. In this case, the existence of admiralty jurisdiction has not been disputed by the parties. The issue to be decided in this case relates to *in rem* jurisdiction, and more specifically whether plaintiffs have alleged sufficient grounds for a maritime lien under the applicable law. The fact that *Lauritzen* does not apply to subject matter jurisdiction questions is not relevant to determining its application to a substantive law question that affects *in rem* jurisdiction.

travel; sailors must be on board during those travels; and occasionally some of those sailors will inevitably be injured.").

■ The general rule appears to be that where the legal relationship is fully executed in a single forum that is certain and unchanging, and an injury subsequently takes place within the jurisdiction of that forum, then the place of the wrong and other factors that point to it are given significant weight in the choice-of-law analysis. Thus, in *Carbotrade, S.p.A.*, 99 F.3d at 91, the court considered a case where the injury alleged was the negligent issuance by a Greek branch office of a vessel inspection certificate. The court found that, "unlike the typical Jones Act case, wherein a seaman is injured aboard a vessel and the place of the tort is often happenstance, [defendant's] conduct was out of an office in a country where [the defendant] had chosen to establish itself . . . ." *Id.* at 91. Although the court was addressing a different factor, the allegiance of the defendants, its reasoning depended more on the fact that, because the office was located in Greece and the injury took place in the office, it was foreseeable that the injury would take place in Greece. *Id.* at 92 ("Because it is the action of employees of BV's Greek office that give rise to the instant dispute, we believe that [the domicile of the defendants] weighs heavily in favor of applying Greek law . . . .").

A few courts have relied on reasoning similar to that of *Carbotrade*'s to enhance the weight of the place of the wrongful act. In *Induron Corp. v. M/V AIGIANIS*, 1989 WL 225023, CIV. A. No 89-305 (D.N.J. Sept. 5, 1989), the court found the place of the wrong a significant factor where a ship had broken loose and damaged the pier it was moored to. The court, echoing *Carbotrade*, found that

[t]his is not a case in which the ship was navigating through waters subject to a variety of legal authorities. Rather, the ship was moored at a pier . . . . Applying United States law would therefore be a predictable, and not a fortuitous, result in this case.

*Id.* at *6.

Likewise, in N*eely v. Club Med Management Services, Inc.*, 63 F.3d 166 (3rd Cir. 1995) (en banc), the court found the place of

an injury more significant where a vessel was either fixed in position (e.g. an oil-rig) or else restricted to local waters, and where it could thus "be predicted at the outset that any injuries will likely occur, nonfortuitously, in the locale where the vessel is stationed. Thus, the justified expectations would not be thwarted if the place of the act were considered a significant choice of law factor." *Id.* at 191.

Here, it was equally predictable that the injuries would take place in Guatemala, as Garcia and Mendoza were hired to perform work only in Guatemala. Thus, the place of the wrong must be given significant weight.

### 2. Law of the Flag/Allegiance of the Owner

Both the allegiance of the owner and the law of the flag point to Kuwait law. The Supreme Court emphasized the importance of the law of the flag, stating that it "overbears most other connecting events in determining applicable law" and that it "must prevail unless some heavy counterweight appears." *Lauritzen*, 345 U.S. at 585-86, 73 S.Ct. 921.

The Court first notes that no party to this litigation has requested the application of Kuwaiti law. There is some support for holding factors of less significance when they point to forums not supported by either side of an action. *See Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 723 (5th Cir.), *reh. denied*, 920 F.2d 931, *reh. en banc denied, Torvald Klaveness and Co. A/S v. Quintero*, 920 F.2d 931 (1990), *cert. denied, Quintero v. Torvald Klaveness & Co., A/S*, 499 U.S. 925, 111 S.Ct. 1322, 113 L.Ed.2d 255 (1991); *Chantier Naval Voisin v. M/Y Daybreak*, 677 F.Supp. 1563, 1568 (S.D.Fla.1988). *See also Pandazopoulos v. Universal Cruise Line, Inc.*, 365 F.Supp. 208 (S.D.N.Y.1973) (importance of allegiance of injured was lessened where choice-of-law was between two countries, neither of which were the domicile of the injured).

■ Further, the weight given to the law of the flag is primarily for those situations where the place of the injury may change over time, as with injuries of sailors aboard a vessel sailing between various international

ports. The law of the flag is applied "on the pragmatic basis that there must be some law on shipboard [and] that it cannot change on every change in the waters." *Lauritzen, Id.* 345 U.S. at 585, 73 S.Ct. 921. Thus, in contrast to the place of the wrong factor, the law of the flag is *reduced* in importance where the forum of the legal relationship is fixed and certain. *See Neely v. Club Med Management Services, Inc.,* 63 F.3d 166, 193 (3rd Cir.1995) (en banc)(the law of the flag not significant where plaintiff instructor was injured by vessel while taking out hotel guests on local scuba diving trips); *Carbotrade,* 99 F.3d at 90 (law of the flag not decisive where injury was negligent issuance of certificate taking place at office of defendant). Here, the injured parties were not sailing between different legal forums, but worked (for the defendant) only within Guatemala.[2] This case therefore falls under *Neely* and *Carbotrade,* and the law of the flag cannot be considered to be weighty.

██ The allegiance of the owner to Kuwait is an important factor, but as noted, its importance is reduced as no one has suggested that Kuwaiti law be applied. *Pandazopoulos, Id.*

### 3. Allegiance of the Injured Parties

The allegiance of the injured parties is an important consideration. *See Rainbow Line, Inc.,* 480 F.2d at 1026. Here, both injured parties were Guatemalan.

### 4. Place of the Contract

Although there was no formal contractual relationship, it is clear that the employment relationship was established in Guatemala.

### 5. Inaccessibility of Foreign Forum

██ Plaintiffs concede that this factor is not relevant here. *See* Pl. Brief Applic. Law, Dkt. No. 32, at 10. The factor "is more pertinent to a forum non conveniens test than to a choice of law test, and the *Lauritzen* court included it as a factor to be weighed in favor of applying [American law] where the compensation scheme of another country only would permit suit in its own courts or when the plaintiff is present in that country." *Carbotrade, S.p.A.,* 99 F.3d at 91. *See also Neely,* 63 F.3d at 190 ("[I]naccessibility is a consideration more appropriate to a forum non conveniens-type analysis .... Therefore, we do not think that the degree to which a [foreign] forum might be inaccessible supports application of American law in this case.") Where there is no bar to applying foreign law in the local forum, the factor is not a consideration to a choice of law decision. *Id. See also Lauritzen,* 345 U.S. at 589–90, 73 S.Ct. 921 ("It is argued ... that justice requires adjudication under American law to save seamen expense and loss of time in returning to a foreign forum. This might be a persuasive argument for exercising a discretionary jurisdiction to adjudge a controversy; but it is not persuasive as to the law by which it shall be judged"). Here, there is no bar to the application of Guatemalan substantive law, i.e., there is no allegation that plaintiffs need to litigate in Guatemala to have their action reviewed under Guatemalan law. The inaccessibility of a foreign forum is therefore not entitled to significant weight.

### 6. The Law of the Forum

The law of the forum is also considered a "weak" factor. *See Neely, Id.; Carbotrade S.p.A.,* 99 F.3d at 91 ("law of the forum ... is irrelevant here because this litigation is in the courts of the United States.") Its chief function may be to add weight where there is specific statutory law intended by Congress to apply to the circumstances. Thus, the court in *Gulf Trading & Transportation Co. v. Vessel Hoegh Shield,* 658 F.2d 363 (5th Cir.), *reh. denied,* 670 F.2d 182 (1981), *reh. en banc denied,* 670 F.2d 182, *cert. denied, Vessel Hoegh Shield v. Gulf Trading & Transportation Company,* 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332(1982), looking at

---

2. The Court declines to decide whether the mere fact that Garcia and Mendoza were injured while over the dock is sufficient to reduce the importance of the flag. However, it is noted that the actual on loading of cargo is closely associated with a vessel, and it seems inappropriate to alter the applicable law depending upon whether a sailor is injured at the beginning of a crane ride (over the dock) or at the end (on the vessel).

the Maritime Lien Statute, which provides that a person shall have a lien for "necessaries" provided to ships, reaffirmed that it

> was the intent of the Congress to make it easier and more certain for stevedores and others to protect their interests by making maritime liens available where traditional services are routinely rendered . . . .

*Id.* at 367 (quoting *Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 201 (5th Cir.1979)). The court concluded that the Maritime Lien Statute represents a "relevant policy of this forum" and thus weighed in favor of applying American law. *Id.* at 367–68.

Plaintiffs do not suggest that there is any analogous statute applicable in this case. The Court therefore finds that the "law of the forum" factor provides no support for the application of American maritime law in this case.

*7. Summary*

 Briefly, three factors point to Guatemala, the place of the wrongful act, the allegiance of the plaintiffs and the place of the contract. The preceding analysis suggests that these factors should be given significant weight.

Two factors point to Kuwaiti law: the allegiance of the shipowners, and the law of the flag. Although these factors are normally given great weight, they are not in this instance for the reasons discussed above.

**3.** Article 839 states:

Preferred credits against the vessel or the price of same are:
1) The notice bonus, professional fee, salvage costs and salaries of the pilots;
2) Port fees;
3) The salaries of the agents and trustees of the vessel and expenses incurred in the maintenance of the hull and tackle, from its entrance into port until its sale;
4) The rent of the warehouse where the tackle and supplies were stored;
5) The wages, bonuses and reimbursements for the Captain and the salaries of the officers and seaman comprising the crew during the last voyage, without prejudice to their privilege with regard to freight charges; incurred for a round trip voyage, these two voyages being considered as one trip in order to apply this privilege. The captain and

Two factors arguably point to American law: the inaccessibility of a foreign forum, and the law of the forum. However, these factors are not significant.

The Court concludes that Guatemalan law must be applied in this case to determine whether plaintiffs have a maritime lien.

**C. Does A Maritime Lien Exist Under Guatemalan Law?**

 When analyzing foreign law, the district court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. *See Trinidad Foundry & Fabricating v. M/V/ K.A.S. Camilla*, 966 F.2d 613, 615 (11th Cir.1992); Fed.R.Civ.P. 44.1. In this case, the defendant has submitted an affidavit from a law professor licensed to practice law before the Courts of Guatemala. *See* Otero Aff. (attached as Exh. A to Atcheson Aff.).

 In this affidavit, Otero states that, under Guatemalan law, the only maritime liens are those expressly created by statutory law. Otero Aff. at ¶ 4, 6. He states that these sorts of liens are referred to as "preferred credits," and the allowable bases for them is laid out in Article 839 of Volume II of the Commercial Code, Decree No. 2946 ("Article 839"). None of the ten provisions of Article 839 establish a maritime lien for wrongful death or injury claims or for claims involving property damage, with the exception of property damage done to cargo.[3] *See*

the crew shall not be entitled to this privilege if their wages were based "on the share or on the freight."
6) All the debts that the Captain incurred during the last voyage for the benefit of the vessel for the purpose of meeting any urgent or inevitable need, including those caused by the purchase of provisions for the passengers and those originating from the sale of a portion of the cargo made for the aforementioned purpose;
7) The amounts that are owed to the last seller of the vessel, to the suppliers of materials, skilled workmen and workers employed in its construction, if no voyage whatsoever was made after the sale or construction; and the amounts owed for work, labor, and supplies utilized in the repair, outfitting and provisioning the vessel for its last voyage, if it has already sailed; [ ]
8) The amounts borrowed under bottomry covering the hull and keel of the vessel for the

Otero Aff. at ¶ 7. The ten provisions of Article 839 are alleged to be the exclusive statutory grounds for a "preferred credit" or maritime lien. *Id.* at ¶ 7. Under this interpretation of the law, therefore, plaintiffs have no statutory grounds for a maritime lien against the defendant.

The plaintiffs have not presented any evidence that contradicts this description of Guatemalan law. Thus, in the absence of a genuine dispute, the Court accepts the defendant's interpretation. There being no maritime lien on the vessel, plaintiffs have no grounds to continue this *in rem* action.[4]

### D. Waiver of Objection to Jurisdiction

■ Plaintiffs argue that the defendant has waived any objection to *in rem* jurisdiction by failing to bring a Rule E(4)(f) hearing and by the absence of such an objection in the Letter of Undertaking or defendant's original answer. Where a vessel makes an appearance in an action and fails to raise the defense of lack of jurisdiction over the party in a timely fashion, the defense may be waived. *U.S. v. Republic Marine, Inc.,* 829 F.2d 1399, 1402 (7th Cir.1987); *Cactus Pipe and Supply Co. v. M/V Montmartre,* 756 F.2d 1103, 1107–11 (5th Cir.1985). *See also Fish v. Bamby Bakers, Inc.,* 76 F.R.D. 511, 513 (N.D.N.Y.1977) (*in rem* jurisdictional objection may be waived in non-admiralty case).

■ Plaintiffs' allegations do not support a conclusion that defendant has waived its jurisdictional objection. Rule E(4)(f) of the Supplemental Rules states that upon the arrest of a ship, a party claiming an interest in the ship is "entitled" to a prompt hearing to show why the arrest should not be vacated.

Rule E(4)(f), Supplemental Rules For Certain Admiralty and Maritime Claims. However, it would be contradictory to interpret the failure to request a hearing as an "appearance," and it therefore provides no basis for a waiver.

■ The Letter of Undertaking, written on behalf of Steamship Mutual Underwriting Assoc. (Bermuda) Ltd. ("Steamship"), the M/V KUBBAR's protection and indemnity club, principally agrees that, in exchange for the release of the vessel, it will (1) file or caused to be filed a "claim of owner" and enter an appearance *in rem* on behalf of the ship and an appearance *in rem* on behalf of the Ship, (2) pay judgment up to $1,500,000, and (3) upon demand, file a bond securing plaintiffs' claim. *See* Fearn–Zimmer Aff. Exh C, attached to Pl. Mem. Opp; No. 95–CV–1150, Dkt. No. 6 (original copy). However, the letter also states that "[t]his letter is written entirely without prejudice to any and all rights and defenses, statutory or otherwise, which the said M/V KUBBAR and/or her owners may have ..., none of which is waived." *Id.* This language cannot be construed to waive any defense or argument, even by implication. *See Coastal Cargo Company, Inc. v. M/V GUSTAV SULE,* 942 F.Supp. 1082, 1087 (E.D.La.1996) (from similar language in another Steamship Mutual Letter of Undertaking, court found it "apparent that there was never any intent to waive" sovereign immunity).

■ As to the original Answer, the Court notes that defendant did deny plaintiffs' allegation that they possessed a valid maritime lien. Ans. ¶ 19. The absence of a maritime lien is the central argument of their jurisdic-

---

purpose of repairing, outfitting and provisioning it for its last voyage;
 9) The insurance premiums taken out for the last voyage on the objects indicated in the preceding paragraph;
 10) The indemnifications due on the value of the merchandise loaded but not delivered and for the damages suffered due to the fault of the Captain or the crew and those due the passengers for objections brought on board the vessel and placed under the care of the Captain.
Otero Aff. ¶ 6.

**4.** Because the absence of a maritime lien is a bar to this *in rem* action, the Court does not reach

defendant's argument that Guatemalan law does not allow an *in rem* action against a ship under any circumstances, and that therefore no *in rem* proceeding should be available in this forum regardless of whether plaintiffs have a maritime lien or not. This argument would impose foreign law to define the availability of *in rem* jurisdiction, a form of jurisdiction over parties. The Court finds little published support for such a broad imposition of foreign law, and there is no need to extend choice-of-law in this case, as the *in rem* action is barred by a more limited ruling based on the absence of a maritime lien.

tional objection, and therefore, to the extent that jurisdiction was based on a maritime lien, the Answer could not be construed as a waiver.[5] Thus, none of the three events relied upon by the plaintiffs constitute a waiver of objection to *in rem* jurisdiction.

■ However, even if the Court were persuaded that the defendant had effectively waived objection to *in rem* jurisdiction in this case, such a waiver would not present a bar to the current motion for summary judgment. In cases allowing a waiver of objection to *in rem* jurisdiction, the waiver is applied only to excuse the absence of an arrest or service of process upon the vessel. *See Republic Marine, Inc.*, 829 F.2d at 1402 (failure to serve process left "no doubt that jurisdiction was never gained over [the vessel] by the supplemental admiralty rules of attachment," but vessel waived objection to jurisdiction by its appearance); *Cactus Pipe & Supply*, 756 F.2d at 1107 ("A claimant, however, can waive the necessity of *in rem* seizure and consent to jurisdiction so far as its interest in the vessel is concerned.").

The opinion in *Lee v. Pearcy Marine, Inc.*, 1994 WL 759929, Civ. A. No. H–91–0700 (S.D.Tex. June 16, 1994) also makes the importance of consent as an alternative to arrest clear. The court stated that "[t]here are two ways for a federal court properly to obtain in rem jurisdiction over a vessel: 1) seizure and/or 2) consent." *Id.* at *2. Insofar as the Court can determine, consent to jurisdiction has never been applied in an admiralty *in rem* action to excuse the absence of a maritime lien. To the contrary, as noted above, numerous cases indicate that, absent such a lien, the maritime action may not continue *in rem.* Indeed, it would make little sense to allow an *in rem* proceeding to continue in the absence of a maritime lien since the enforcement of the lien is the proceeding's sole purpose. *See Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904, 908 (4th Cir.1981) (purpose of *in rem* proceeding in admiralty "has always been to provide a means for enforcing a maritime lien, which is the central element of an *in rem* proceeding"); *Itel Containers Intern. Corp. v. At-*

*lanttrafik Exp. Service Ltd.*, 982 F.2d 765, 766 (2d Cir.1992) (a maritime lien "is a special property right in the vessel" which "arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds"). Thus, consent to jurisdiction would not in any case prevent defendant from arguing that no maritime lien exists under Guatemalan law.

### E. Laches

■ Plaintiffs next argue for the upholding of jurisdiction in this case on the equitable grounds that defendant waited too long before specifically alleging an *in rem* jurisdictional objection. In support of their argument, they cite *Conte v. Flota Mercante Del Estado*, 277 F.2d 664 (2d Cir.1960). In that case, the court held that a district court had not abused its discretion in denying a *forum non conveniens* motion where defendant had failed to make its motion until late in the litigation. *Id.* at 668. The issue was thus whether the court should retain jurisdiction where jurisdiction was conceded to be valid, but inconvenient. *Id.* at 667 ("Respondent concedes as it must that its objection does not go to the jurisdiction" of the court). *Conte* thus provides no support for discretion in a court's determination of whether valid jurisdiction exists in the first place. Further, to the extent that *Conte* can be understood to hold that a defendant must allege jurisdictional objections early in the litigation, then it merely restates the rule regarding waiver or consent. As noted above, the waiver rule provides no bar to an objection that no maritime lien exists. There is therefore no basis for finding that defendants are equitably estopped from asserting absence of such a lien.

### F. Amendment of Complaint To Allege In Personam Action

Plaintiffs request that, as an alternative to dismissal of the action, they be allowed to "bring a motion to amend the Complaint to state a cause of action against the owner of the owner of defendant vessel *in personam*

---

**5.** On June 10, 1996, defendant did file an amended answer which alleges that "[t]his Court lacks *in rem* jurisdiction over M/V KUBBAR." Amend. Ans. ¶ 27.

under Guatemalan law." Pl. Mem. Opp. at 17. This request must be denied. The owner, a Kuwaiti company, has no contacts with this forum other than the temporary presence of its ship here. If that, by itself, were sufficient to establish *in personam* jurisdiction, then any case involving *in rem* seizure of a vessel would necessarily grant the court *in personam* jurisdiction over the owner. As the Eleventh Circuit has found, to hold that a court has in personam jurisdiction over any participant in an in rem proceeding "does not comport with the traditional analysis of in rem jurisdiction." *United States v. One Lear Jet Aircraft, Serial No. 35A–280, Registration No. YN–BVO*, 836 F.2d 1571, 1577 (11th Cir.), *reh. denied,* 842 F.2d 339, *cert. denied,* 487 U.S. 1204, 108 S.Ct. 2844, 101 L.Ed.2d 881 (1988).

Further, due process requires, where jurisdiction is based on a limited contact between the defendant and the forum, that plaintiffs must also allege that the cause of action arises out of or relates to the specific contact alleged. *See Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.,* 792 F.2d 989, 993 (11th Cir.1986). In this case, plaintiffs' cause of action relates to the vessel, but not to the vessel's contact with New York. Plaintiffs therefore lack sufficient basis for obtaining jurisdiction over the owner. An amendment to plead an *in personam* action would therefore be futile, and there is no justification for delaying judgment. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (futility is grounds for denying leave to amend); *Perez & Compania (Cataluna) S.A. v. M/V Mexico I,* 1985 WL 6069, *1, Civ. A No. H–84–2198 (S.D.Tex. Oct. 30, 1985) (relevant considerations in granting motion to amend *in rem* complaint to include *in personam* cause of action included futility).

Accordingly, it is

ORDERED that plaintiff's motion for application of American law is DENIED; and it is further

ORDERED that defendant's motion for summary judgment is GRANTED, and the within action is dismissed for lack of *in rem* jurisdiction; and it is further

ORDERED that the warrant for arrest is quashed, and the security posted by defendant or on its behalf is released and exonerated; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.